IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 06-131- SLR |
| | ) | |
| LESTER PITTMAN | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

**NOW COMES** the United States of America, by and through its undersigned attorneys, and hereby responds to Defendant's Motion to Suppress Evidence, as follows:

**Factual Background**

The government expects that the evidence at the suppression hearing will show the following facts:

1.   Between June and October, 2006, Task Force Officer Ronald Marzec was supplied with information from a confidential informant (CI), who had been present when a black male known to the CI as "Lester" was cooking and selling crack cocaine from a house in Delmar, Delaware, owned by Warren Brittingham. Officer Marzec conducted surveillance on Brittingham's house and twice observed a Gold GMC Yukon parked outside, which was registered to Robany Pittman, Lester Pittman's wife. The CI had told Officer Marzec that "Lester" drove a Yukon.[1]

---

[1] Officer Marzec had a total of two meetings with the CI, and other information provided by the CI had been corroborated and had led to an arrest and seizure of drugs and firearms from another individual.

2.      On October 6, 2006, at approximately 7:45 p.m., Officer Marzec was conducting surveillance at Brittingham's house and again saw the Gold Yukon outside Brittingham's house. Officer Marzec used binoculars to observe an individual — later identified as the defendant, Lester Pittman — come from the house and enter the Gold Yukon's driver-side door. Just as the defendant was getting into the car, another car, driven by an unknown white male, backed in behind the Yukon. The white male got out of his car and approached the Gold Yukon's driver-side window. From his vantage point, Officer Marzec could clearly see the defendant engage in a hand-to-hand transaction with the white male.[2] Following the transaction, both cars drove away.

3.      Officer Marzec followed the defendant's car and observed the defendant commit a traffic violation by failing to properly signal for a turn. Based on his observations, Officer Marzec radioed for Officer Thomas Esham of the Delmar Police Department to conduct a traffic stop. Officer Marzec followed closely behind Officer Esham. Officer Esham observed two additional traffic violations when the defendant twice crossed the center line.

4.      Officer Esham initiated the traffic stop and the defendant pulled over approximately 100 yards south of Line Road, just over the Maryland-Delaware border. He noticed that the defendant appeared very nervous, to the point where his hands were shaking. Officer Esham returned to his police car to write up a warning, following his normal traffic stop procedures. Meanwhile, as the vehicle was being stopped, Officer Marzec requested a K-9 unit from the Wicomico County Sheriff's Office.

---

[2]Officer Marzec could see the white male pull an object, which he believed to be money, from his pants pocket, and hand it to the defendant. The white male then received something from the defendant, looked at it, and put it into his pocket.

5.      While Officer Esham was still processing the traffic violation, Deputy First Class Karl Kurten of the Wicomico County Sheriff's Department arrived, approached the defendant's car, and told the defendant that he was going to conduct a K-9 scan. Deputy Kurten observed that the defendant appeared nervous. The defendant asked the officers if he could get out of the car while the K-9 scan was being conducted. When the defendant got out of the car, Deputy Kurten asked him if he had any weapons and told him that he was going to conduct a pat-down search for officer safety. Prior to the pat-down, the defendant did not comply with Deputy Kurten's request to keep his hands on the car, and kept reaching for the exterior pocket of his jacket/sweatshirt. When Deputy Kurten patted the outside pocket of the defendant's sweatshirt, he felt a heavy object, about five inches in length. The defendant again attempted to put his hands into this pocket. Deputy Kurten asked the defendant what the object was and the defendant did not respond. Deputy Kurten then asked if the object was a knife, and again, the defendant did not respond, but instead tried to reach his hand inside the pocket. Deputy Kurten ordered the defendant to put his hands on the trunk, and reached into the pocket and grabbed the item. The object turned out to be a flashlight, approximately 4 or 5 inches in length. In grabbing the flashlight from the defendant's pocket, Deputy Kurten also pulled out a partial cigarette and a baggy containing suspected crack cocaine.

6.      Based on the discovery of the suspected crack cocaine, Officer Marzec and Deputy Kurten placed the defendant under arrest. A search incident to arrest yielded another baggy containing suspected crack cocaine in the defendant's left front jacket pocket. An inventory search of the defendant's gold Yukon revealed two additional baggies of suspected crack cocaine in a compartment in a rear cargo area of the vehicle. One baggy contained 14 individually wrapped packages, each divided into approximately equal weight chunks of crack cocaine. The second baggy

contained one large package with approximately 1 ounce of crack cocaine. In addition, a digital scale, a cellular phone, and some paperwork were seized from the car.

7. Officer Esham transported the defendant back to the Delmar Police Station, during which time the defendant initiated a conversation in which he made several statements, including stating numerous times, "They ain't got s - - t on me, that was illegal search and seizure and false arrest," and "I'll sit in jail for a few weeks and get off this s - - t." Officer Esham had not questioned the defendant and made no comment in response to the defendant's statements.

8. After the defendant was brought to the Delmar Police Station, the defendant initiated another conversation in the presence of Officer Esham and Deputy Kurten. The defendant discussed the cash box that was found in the Gold Yukon, and stated it contained old coins, silver certificates and a letter, and was seeking assurance that his property was secure. The officers assured him that it was secure. Officer Kurten then inquired why he kept the box in the truck, and the defendant replied that it was a safe place to keep the box because "no one else ever gets into his truck."

9. The defendant then told the officers that he was not feeling well. The officers asked the defendant if he swallowed any drugs, and he acknowledged that he had swallowed rocks of crack cocaine during the traffic stop. The defendant was sent in an ambulance to Peninsula Regional Medical Center for treatment, where he remained for several hours, guarded by Officer Marzec.

10. While he was recovering at the hospital, the defendant initiated a conversation with Officer Marzec. The defendant wanted to know "who did me?" and began listing people who might have set him up, including mentioning the name "Rene" — referring to Warren Brittingham, the owner of the house at which the initial hand-to-hand transaction was observed. When Officer Marzec replied, "you never know," the defendant stated, "No, because you only got 100 grams and

that's nothing. Rene could have hurt me real bad. It wasn't him." At one point, the defendant asked Officer Marzec whether he knows an individual named Winfred Travis. Officer Marzec responded, "No, who is he?" The defendant speculated that it was Travis who set him up because Travis had been arrested earlier that year following a drug-purchasing trip the two had taken together to Wilmington. After this conversation, the defendant asked Officer Marzec if he had ever been shot, and added, "You know I am a violent offender, sometimes after people like us get out of jail we shoot other people." The defendant asked Officer Marzec if he had any children and warned that "they had better be careful."

**Legal Argument**

11. The defendant contends that the police lacked probable cause to conduct the traffic stop of the defendant's vehicle, and further challenges the pat-down of the defendant's clothing that led to the discovery of crack cocaine. The defendant also asks this Court to suppress statements made by the defendant while he rode with Officer Esham to the police station and while he was recovering in the hospital.

*A.    The traffic stop.*

12. First, there was reasonable suspicion to make the traffic stop based on the traffic violations observed by Officer Marzec and Officer Esham. *United States v. Delfin-Colina*, 464 F.3d 392, 397-98 (3d Cir. 2006) (holding that "the *Terry* reasonable suspicion standard applies to routine traffic stops" such that "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop"). The officers observed three separate traffic violations, any of which would justify the initial stop.

13. Furthermore, Officer Esham will testify that, by the time Deputy Kurten arrived at the scene of the traffic stop, he had not completed processing the traffic violation and the defendant had been detained for between ten and fifteen minutes. At this point, the traffic violation alone was sufficient justification for the stop. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (upholding a dog sniff conducted during the time the defendant was lawfully seized for a traffic violation).

14. Alternatively, the stop was justified based on the information gleaned from the CI regarding the defendant's drug activities combined with Officer Marzec's observations of the defendant engaging in a hand-to-hand drug transaction immediately preceding the traffic stop. *See United States v. McGlory*, 968 F.2d 309, 343 (3d Cir. 1992) ("[The officer] observed Tempolski approach Cotton's vehicle, get in the vehicle, and hand Cotton money. These circumstances plainly gave rise to a reasonable suspicion sufficient for an investigative stop.").

### *B.   The pat-down.*

15. Once Deputy Kurten arrived, the defendant asked to get out of the car. At any rate, an officer may order the driver out of a vehicle during a traffic stop without any particularized suspicion. *See United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977)).

16. Once the traffic stop was conducted, the police officers were entitled to conduct a pat-down search of the defendant based on reasonable suspicion that he was armed. Reasonable suspicion regarding weapons may be established by information that the defendant was involved in drug activity — including the evidence from the CI that the defendant was dealing drugs and Officer Marzec's observation of the hand-to-hand transaction involving the defendant immediately before the stop. *See United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) (upholding pat-down

where officer "became concerned for his safety because persons involved with drugs often carry weapons" and concluding that "[t]his procedure is the very essence of the practice sanctioned by *Terry v. Ohio*"). Further bolstering the basis for the pat-down is the fact that the defendant appeared nervous, would not comply with Deputy Kurten's requests to keep his hands on the police cruiser, repeatedly reached his hand toward the exterior pocket of the sweatshirt, and would not state whether the object was a knife. *See United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) ("Moorefield's furtive hand movements and refusal to obey the officers' orders [to show his hands and exit the vehicle] constituted suspicious behavior . . . Moorefield leaned back and appeared to shove something down toward his waist. Moorefield's behavior embodied the kind of specific, articulable facts that *Terry* contemplates and, therefore, warranted a pat-down search for weapons.").

17. Officer Kurten conducted a limited pat-down on the exterior of the defendant's clothing and did not reach into the defendant's pocket until after he felt a long, hard object that he reasonably believed was a weapon. It was at this point that Officer Kurten justifiably reached into the defendant's pocket to take out the object, which turned out to be a five-inch flashlight. *See United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (holding that officer lawfully reached into the defendant's pocket and opened a four-by-six inch envelope, because a small-caliber handgun could have "roughly the same feel inside the envelope as did the credit cards it [in fact] contained."). The partially smoked cigarette and the baggy of suspected crack cocaine came out together during the removal of the flashlight.

18. The discovery of crack cocaine established probable cause for the defendant's arrest, which in turn justified the search incident to arrest and the subsequent inventory search. *See McGlory*, 968 F.2d at 343 (finding that once a small amount of heroin was discovered as a result of

a pat-down search, and a bag of powder was observed in the front seat, "[t]hese additional circumstances converted the initial reasonable suspicion into probable cause to search the vehicle")

### C. *The defendant's statements*

19. The Government acknowledges that the defendant was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), at the time he made the challenged statements. The defendant, however, initiated the statements, which were not the product of custodial interrogation. In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court held that "'[i]nterrogation' as conceptualized in the *Miranda* opinion, requires a measure of compulsion above and beyond that inherent in custody itself," and thus interrogation is limited to words or actions by law enforcement which are "reasonably likely to elicit an incriminating response." *Id.* at 301. None of the defendant's statements were made in response to "interrogation" as defined by *Innis*.

20. Clearly the comments made by the defendant in the patrol vehicle were not the product of custodial interrogation because Officer Esham asked no questions of the defendant and did not respond to the defendant's monologue. *See id.* at 300-301. For the same reason, the defendant's statements to Officers Kurten and Esham at the Delmar police station regarding the contents of the cash box found in the defendant's Gold Yukon are admissible because the defendant voluntarily and spontaneously initiated this conversation.

21. After these spontaneous statements, Deputy Kurten responded by asking the defendant why he kept the cash box in the truck, and the defendant responded that he keeps the box there because no one else ever gets into his truck. Courts of appeals have held that such a "request for clarification of a spontaneous statement generally does not constitute interrogation." *United*

*States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005).[3] Similarly, the defendant's statements in the hospital were spontaneous and were not made in response to any actions or questions by Officer Marzec. Officer Marzec gave minimal responses to the defendant's lengthy colloquy. To the extent any question was asked of the defendant, it was of the limited, clarifying nature that did not rise to the level of police interrogation.

22. Immediately before being taken to the hospital, the defendant had told officers that he was not feeling well and Deputy Kurten and Officer Esham asked the defendant if he had swallowed any drugs. The defendant's affirmative response falls under the public safety exception recognized by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 656 (1984), which held that Miranda does not apply to situations "in which police officers ask questions reasonably prompted by a concern for the public safety." Here the officer's questions were reasonably required to determine the defendant's need for medical treatment. *Quarles* warned against placing police in the "untenable position" of having to decide between "neutralizing the volatile situation confronting them" and rendering otherwise probative evidence of criminal activity inadmissible because of the lack of *Miranda* warnings. *Id.* at 657-58. The officers in this case had to make a prompt

---

[3] *See also United States v. Morton*, 391 F.3d 274, 276 (D.C. Cir. 2004) ("Officer Parker's statements-that [the defendant's] vehicle would be impounded and that she had been arrested on a serious charge . . . were directly responsive to what the defendant had said and were not reasonably likely to elicit an incriminating response."); *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (admitting, in the absence of the *Miranda* warnings, a custodial colloquy between a police officer and the defendant in which the defendant volunteered the statement, "I stabbed her," the police officer responded, "Who?" and the defendant said "Cathy"); *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (finding no interrogation occurred where drug dealer saw police officers were confiscating his notebook and said, "You can't take that," to which a police officer responded, "Why" and drug dealer stated, "I can't run my business without that"); 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.7(d) (2d ed. 2007).

determination regarding the defendant's medical needs, and thus *Quarles* would not require them to precede their questions with the *Miranda* warnings.

**WHEREFORE,** the United States requests that the Court deny, following the evidentiary hearing, the defendant's Motion to Suppress Evidence.

                                              Respectfully submitted,

                                              COLM F. CONNOLLY
                                              UNITED STATES ATTORNEY

                                              BY: _____
                                              Ilana H. Eisenstein
                                              Assistant United States Attorney

Dated: March 20, 2007

**CERTIFICATE OF SERVICE**

I, Theresa A. Jordan, an employee with the United States Attorney's Office, hereby certify that on March 20, 2007, electronically filed the foregoing:

**GOVERNMENT RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

with the Clerk of the Court using the CM/ECF which will send notification of such filing to:

> Christopher S. Koyste, Esquire
> Assistant Federal Public Defender
> 704 King Street, Suite 110
> Wilmington, Delaware 19801

*Theresa A. Jordan*