IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 06-131-SLR |
| | : | |
| LESTER PITTMAN, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
PRETRIAL MOTION TO SUPPRESS EVIDENCE**

Defendant, Lester Pittman, by and through his undersigned counsel, Christopher S. Koyste, respectfully submits this Memorandum of Law in support of his Pretrial Motion To Suppress Evidence. For the reasons set forth below, Mr. Pittman seeks to exclude the Government's admission, at trial, of any and all evidence that was obtained after law enforcement officials conducted an impermissible patdown, and any and all alleged statements that were made after these officials failed to administer his Miranda rights after he was taken into custody.

I.   **INTRODUCTION**

On November 16, 2006, Mr. Pittman was indicted by the Grand Jury for the District of Delaware for possession with the intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). On January 26, 2007, Mr. Pittman filed a Pretrial Motion to Suppress Evidence. The grounds for Mr. Pittman's motion related to a traffic stop of his vehicle and subsequent patdown, and alleged statements that he made after his arrest. On March 28, 2007,

the Court conducted a hearing to determine Mr. Pittman's motion.

Mr. Pittman contends that the officers' protective frisk, which was conducted during a traffic stop, exceeded the limitations of Terry v. Ohio, 392 U.S. 1 (1968) because the frisk was not limited to a search for weapons. Therefore, any evidence obtained as result of Mr. Pittman's impermissible frisk must be suppressed pursuant to Terry. Additionally, Mr. Pittman's alleged voluntary statements must be excluded because the officers failed to administer his rights pursuant to Miranda v. Arizona, 348 U.S. 436 (1966), prior to, or during, his alleged voluntary statements.

## II.  FACTUAL BACKGROUND

On October 6, 2006, Task Force Officer Ronald Marzec, of the Drug Enforcement Administration, conducted surveillance of a home in Delmar, Delaware. Officer Marzec observed Mr. Pittman enter a gold GMC Yukon that was parked outside of the home, and a vehicle pull up to the rear of his vehicle. An unidentified male driver exited the car and walked to the driver's window of Mr. Pittman's vehicle.

Officer Marzec alleges that he observed Mr. Pittman and the unidentified male engage in a hand-to-hand transaction. Officer Marzec, however, did not specify in his report what he observed during the hand-to-hand transaction.

Officer Marzec observed Mr. Pittman and the unidentified male leave the scene in their respective vehicles. Officer Marzec followed Mr. Pittman, and called in Officer Thomas Esham of the Delmar Police Department to conduct a traffic stop of Mr. Pittman's vehicle for minor traffic violations.

Officer Esham conducted the traffic stop of Mr. Pittman's vehicle and advised him of the

traffic violations. Officer Esham alleges that Mr. Pittman acknowledged the violations and appeared to be nervous, because his voice cracked and hands shook as he produced his driver's license. Officer Esham returned to his vehicle and initiated a written warning for Mr. Pittman.

In the meantime, Officer Marzac contacted the Wicomico County Sheriff's Department to request K-9 Unit assistance. Deputy First Class Karl Kurten responded and arrived with his police dog.

According to Officer Marzac's report, Deputy Kurten advised Mr. Pittman, who was nervous, that he was going to conduct a K-9 scan of his vehicle. Mr. Pittman asked the officers if he could get out the vehicle while Deputy Kurten conducted the K-9 scan. Mr. Pittman exited the vehicle, and Deputy Kurten asked if he had any weapons. Officer Marzac alleges that Mr. Pittman's response was inaudible.

Deputy Kurten told Mr. Pittman that he was going to conduct a pat-down search for officer safety. After Deputy Kurten patted down Mr. Pittman's clothing, he felt a heavy object that was approximately five inches long in Mr. Pittman's right front jacket. Officer Kurten asked Mr. Pittman what was in his pocket, and alleges that, in response, Mr. Pittman attempted to put his hands into the pocket.

Officer Kurten claimed that he repeatedly asked Mr. Pittman if he had a knife in his pocket, but Mr. Pittman did not respond. Mr. Pittman complied with Deputy Kurten's request for him to put his hands on the vehicle. Deputy Kurten alleges that he reached into Mr. Pittman's right front jacket pocket to take out the heavy item to ensure that it was not a weapon. Deputy Kurten removed a silver flashlight, a partial cigarette and a baggie that contained a cream-colored rock-like substance.

Deputy Kurten believed that the substance was crack cocaine, and reported his findings to Officer Marzac. Officer Marzac arrested Mr. Pittman, conducted a search incident to arrest and discovered a second baggie of suspected crack cocaine in his left front jacket pocket. The officers searched Mr. Pittman's vehicle and found more of the rock-like substance, a digital scale, a cellular telephone and miscellaneous paperwork. Mr. Pittman was taken to a hospital shortly after his arrest, because he reported to the officers that he had ingested cocaine base prior to the arrest.

### III.   MARCH 28, 2007 MOTION HEARING

On March 28, 2007, this Court held a hearing on Mr. Pittman's suppression motion. At the hearing, the Government presented Officer Marzac, Officer Esham and Deputy Kurten.

#### A.  Officer Marzac's Testimony

Officer Marzac testified about the circumstances surrounding Mr. Pittman's arrest. Specifically, Officer Kurten testified that during his initial surveillance of Mr. Pittman, he believed that he had witnessed a drug deal. Tr. at 20. Officer Marzac testified, however, that he was not certain as to the items that were exchanged between Mr. Pittman and the unidentified male individual, and that he did not contact other law enforcement officials to investigate the unidentified male individual for his role in the alleged drug purchase. Tr. at 55, 57, 59.

Shortly after the alleged transaction, Officer Marzac followed Mr. Pittman and contacted Officer Esham to conduct a traffic stop of Mr. Pittman, and Deputy Kurten for K-9 assistance. Tr. at 24.

Officer Marzac testified that after Deputy Kurten arrived, he advised Mr. Pittman that he was

going to conduct the K-9 scan of his car. Tr. at 32. Mr. Pittman subsequently exited the vehicle, and, according to Officer Marzac, continuously put his hands into his pockets. Tr. at 34. Officer Marzac testified that he observed a heavily weighted object swinging in Mr. Pittman's sweatsuit jacket pocket, and that Deputy Kurten repeatedly advised Mr. Pittman to keep his hands away from his pocket. Tr. at 34.

Officer Marzac testified that Deputy Kurten reached into Mr. Pittman's jacket pocket and instantaneously removed the weighted object, which was a small flashlight, a baggie of suspected crack cocaine and a cigarette. Tr. at 35, 87-89. Officer Marzac subsequently searched Mr. Pittman and his vehicle after his arrest and discovered additional suspected crack cocaine. Tr. at 35.

Officer Marzac further testified that Officer Esham transported Mr. Pittman to the Delmar Police Station, and that Officer Esham informed him that Mr. Pittman had been taken to a hospital because he had ingested a large quantity of crack cocaine. Tr. at 38-39. Officer Marzac alleged that Mr. Pittman, who was taken to a receiving area for treatment, initiated a conversation with him at the hospital. Mr. Pittman allegedly "asked who set him up," and inquired about a list of names. Tr. at 40. Officer Marzac further alleged that Mr. Pittman had dramatic mood swings, and asked additional questions about possible people that may have set him up. Tr. at 41. Officer Marzac testified that no law enforcement officials provided Mr. Pittman with his <u>Miranda</u> rights, and that he had been placed into handcuffs during the entire time that he was in custody. Tr. at 79.

### B. Officer Esham's Testimony

Officer Esham testified that he received a call from Officer Marzac, which described Mr. Pittman's vehicle and reported that he had failed to properly use a turn signal. Tr. at 95-96. Officer

Esham stated that he subsequently saw a vehicle matching the description provided by Officer Marzac, and observed the vehicle cross the center divided line and travel above the posted speed limit. Tr. at 98.

Officer Esham stated that he conducted the traffic stop, and that Mr. Pittman advised him that he was aware of the violations and was in a hurry. Tr. at 99. Officer Esham characterized Mr. Pittman as nervous, and stated that his voice was shaking and cracking as he spoke. Tr. at 100.

Officer Esham testified that after Officer Marzac arrived on the scene, he requested K-9 assistance. Tr. at 102. Officer Esham also recalled Deputy Kurten's arrival on the scene, and testified that he watched Officer Marzac and Deputy Kurten approach Mr. Pittman's vehicle and speak to him. Tr. at 102. Officer Esham did not observe the officers' pat-down of Mr. Pittman. Tr. at 102, 127. Officer Esham also testified that Mr. Pittman did not have any violations on his license, and that he wrote a warning for the traffic violations that he had personally observed. Tr. at 103.

Officer Esham further testified that he transported Mr. Pittman to the Delmar Police Department, and Mr. Pittman expressed his unhappiness about the arrest. Tr. at 111. Officer Esham stated that he did not give Mr. Pittman his <u>Miranda</u> warnings, did not ask him any questions and advised him to speak to Officer Marzac. Tr. at 111. Officer Esham testified that Mr. Pittman later informed him at the police station that he had swallowed drugs. Tr. at 112-114.

### C. **Deputy Kurten's Testimony**

Deputy Kurten testified that he made contact with Officer Esham and Officer Marzac, who requested a K-9 scan. Tr. at 132. Deputy Kurten stated that, upon arrival, he informed Mr. Pittman that he was going to conduct the K-9 scan, and that Mr. Pittman appeared to be nervous. Tr. at 133.

According to Deputy Kurten, Mr. Pittman requested to exit the vehicle during the K-9 scan, and he advised Mr. Pittman that he was going to pat him down for weapons. Tr. at 134. Deputy Kurten testified that Mr. Pittman was still nervous and attempted to put his hand in his exterior jacket pocket. Tr. at 134. Deputy Kurten advised him to keep his hands out of his pocket and began the patdown. Tr. at 134.

Deputy Kurten testified that as he was patting down Mr. Pittman's jacket, he felt a heavy object in the pocket, which caused the jacket to swing. Tr. at 135. Deputy Kurten testified that Mr. Pittman stated that the object was a knife. Deputy Kurten advised Mr. Pittman to put his hands up on the truck. Tr. at 135. Deputy Kurten then asked Mr. Pittman if there was a knife in his pocket, but Mr. Pittman did not respond. Tr. at 136. Deputy Kurten testified that he "made a loose scoop" of Mr. Pittman's pocket, "and[,] without fishing around in the pocket[,] [retrieved] a flashlight, partial cigarette butt and a baggie" of what he believed to be crack cocaine. Tr. at 136. According to Deputy Kurten, he was "just looking to pull out the object," and as he pulled out the flashlight, the cigarette butt was laying next to the light, and the suspected crack cocaine was sitting on top. Tr. at 138.

On cross-examination, Deputy Kurten stated that his objective was to remove the item that he suspected to be a weapon. Tr. at 143-144. Deputy Kurten testified, however, that he "went around the outside, cupped the objects and then lifted them out of the pocket." Tr. at 144.

After Mr. Pittman's arrest, Deputy Kurten conducted a search incident to arrest and found additional suspected crack cocaine and a digital scale. Tr. at 139-140. Deputy Kurten arrived at the Delmar Police Station and did not question Mr. Pittman, who expressed concern over personal items in the truck. Tr. at 141.

## IV.  DISCUSSION

### A.  The Evidence Seized After The Officer's Patdown Search Should Be Suppressed Because the Search Exceeded The Scope of Terry v. Ohio.

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. U.S. CONST. Amend. IV.  In Terry v. Ohio, 392 U.S. 1, 30 (1968), and its progeny, the Supreme Court determined that the Fourth Amendment permits police officers to conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that "criminal activity is afoot."

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure of persons' within the meaning of this provision."  Whren v. United States, 517 U.S. 806, 809 (1996).  In "justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Terry, 392 U.S. at 21 (stating that this "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence").

Pursuant to Terry, an officer may briefly stop a person suspected of criminal activity and frisk the suspect if he or she believes that the person is carrying a weapon.  Id. at 24.  "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."  Adams v. Williams, 407 U.S. 143, 146 (1972).

The protective frisk, however, must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby."  Terry, 392 U.S. at 26.  If the protective search exceeds what is necessary to determine whether the suspect has a weapon, the search

is no longer valid, and any evidence obtained must be suppressed. See Sibron v. New York, 392 U.S. 40, 65 (suppressing evidence where officer "thrust" his hands in defendant's pocket and retrieved heroin because the "search was not reasonably limited to . . . disarming a potentially dangerous man"); see also Wong Sun v. United States, 371 U.S. 471 (1963) (stating that evidence seized during an illegal seizure must be excluded pursuant to the "fruit of the poisonous tree doctrine"); Segura v. United States, 468 U.S. 796 (1984) (stating that evidence obtained as the direct result of an illegal search or seizure is plainly subject to exclusion); Baker v. Monroe Township, 50 F.3d 1186,1194 (3d Cir. 1995) (stating that "when a protective search goes beyond a search for weapons and becomes a search for evidence, it is no longer valid under Terry").

In Minnesota v. Dickerson, 508 U.S. 366, 378 (1993) the Supreme Court determined that a police officer "overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under Terry." The Court stated that it "has been sensitive to the danger . . . that officers will enlarge a specific authorization, furnished by a warrant or exigency, into the equivalent of a general warrant to rummage and seize at will," particularly where the "officer[,] who is executing a valid search for one item[,] seizes a different item . . . ." Id.

Here, the officer's search for weapons exceeded the scope of a Terry patdown. The officer, who had observed a heavy object in Mr. Pittman's jacket pocket, reached into the jacket pocket and instantly pulled out all of the items instead of limiting his search to the suspected weapon. Indeed, the officer's testimony during the suppression hearing is contradictory. On one hand, the officer testified that he was "just looking to pull out the object" that he suspected to be weapon. Tr. at 138. The officer, however, also testified that he "went around the outside, cupped the objects and then lifted them out of the pocket." Tr. at 144 (emphasis added). In other words, the officer did not simply

9

reach for the suspected weapon but, instead, grabbed everything that was in Mr. Pittman's pocket and pulled it out. The officer's patdown is impermissible under Terry, and amounted to a "rummage and seiz[ure] at will." Minnesota, 508 U.S. at 378. Accordingly, the evidence seized from the officer's patdown, as well as evidence seized during the search incident to arrest, should be suppressed. See e.g., Sibron, 392 U.S. at 40; Wong Sun, 371 U.S. at 471; Baker, 50 F.3d at 1186.

### B. Mr. Pittman's Statements Should Be Suppressed Because The Law Enforcement Officials Did Not Provide Miranda Warnings.

The Court should suppress any statements made by Mr. Pittman after he was in custody because he was not informed of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Miranda requires officers to issue warnings to a suspect after they have placed the individual into custody and before they initiate interrogation.[1] See Stansbury v. California, 511 U.S. 318 (1994) (stating that an officer's obligation to administer Miranda warnings attached when there has been a restriction on the person's freedom, such as a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest).

---

[1] Courts have made clear that interrogation is not limited to direct questioning by the police. In United States v. Benton, 996 F.2d 642, 644 (3d Cir. 1993), the Third Circuit noted that, under Miranda, "the police by using psychological ploys and subtle compulsion effectively can conduct custodial interrogation." Thus, it is important to consider the circumstances at the time the defendant made the statement. See also Rhode Island v. Innis, 446 U.S. 291 (1982) (stating that a suspect in custody is protected from the "functional equivalent" of interrogation from "any words or actions on the part of the police (other than those normally attendant upon arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'") (emphasis in original). The Innis Court also explained that "[a]nalysis of whether particular words or conduct are likely to elicit incriminating statements 'focuses primarily upon the perceptions of the suspect, rather than on the intent of the police.'" Id. at 301.

The police can question a suspect without counsel present and introduce at trial statements made during interrogation if the suspect has knowingly, voluntarily and intelligently waived his Miranda rights. "Where a defendant seeks to suppress a post-arrest statement, the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of Miranda warnings," or that the "interrogation fits within a recognized exception to the Miranda rule." United States v. Desumma, 44 F.Supp.2d 700, 703 (1999) citing Colorado v. Connelly, 479 U.S. 157, 168 (1986).

In United States v. Fioravanti, 412 F.2d 407, 413 (3d Cir. 1969), the Third Circuit stated that "Miranda created a presumption of coercion by the mere presence of the dual factors of a police-initiated interrogation and the defendant's being in custody . . . This presumption of coercion may be rebutted by the simple expedients of the defendant's having counsel present or perfecting a knowledgeable and intelligent waiver of the right to remain silent and to have counsel at his side. Once the cloak of the presumption is removed, and with it the concept of constructive compulsion, the constitutional prohibition also falls; the statement then becomes a voluntary utterance."

In Oregon v. Elstad, 470 U.S. 298 (1985), the Supreme Court agreed that the failure to administer Miranda warnings creates a presumption of compulsion. The Court explained that "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda[,] [and] Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm." Id. at 307-08; see also United States v. Naranjo, 426 F.3d 221, 227 (3d Cir. 2005) (stating that "in the absence of coercion, it is necessary to determine if the intervening warnings were sufficient to inform the suspect of his/her rights so that the suspect could properly determine whether to waive the

protections of Miranda and make statements to the police. The inquiry therefore focuses on whether the rights were knowingly and intelligently waived.")

The Government previously acknowledged that Mr. Pittman was in custody for Miranda purposes. See Government's Response To Defendant's Motion to Suppress Evidence, at 9. Despite Mr. Pittman's custody, none of the three officers administered Miranda warnings at any point after Mr. Pittman's arrest. Instead, the officers alleged that they did not attempt to engage Mr. Pittman in any questioning, and that he continued to make voluntary statements from the time of his arrest to the time that he was in the hospital. If the court credits the testimony of these officers, that they did not initiate any interrogation of Mr. Pittman or, by their actions conducted a subtle interrogation, Mr. Pittman submits that the police officers' alleged silence was merely an attempt to circumvent Miranda's requirements.

At the outset, the officers have provided no reason for their failure to administer Miranda warnings. Moreover, there were no prior, intervening or subsequent warnings by the officers prior to Mr. Pittman's alleged voluntary statements. Thus, Mr. Pittman could not have made a voluntary, knowing and intelligent waiver of his Miranda rights. See Naranjo, 426 F.3d at 227. As noted by the Supreme Court, regardless of whether Mr. Pittman suffered no identifiable constitutional violation, his unwarned, voluntary statements must be excluded pursuant to Miranda. See Oregon, 470 U.S. at 307-08.

Mr. Pittman notes that the Government previously argued that his "affirmative response falls under the public safety exception recognized by the Supreme Court in New York v. Quarles," 467 U.S. 649, 656 (1984 . . ." See Government's Response to Defendant's Motion To Suppress Evidence, at 9. This is a misinterpretation of the public safety exception expressed in Quarles. See United States

v. Johnson, 95 Fed.Appx. 448,452 (3d Cir. 2004) (explaining that the purpose of the Quarles public safety exception is to "'secure [the officers' safety] or the safety of the public' and was 'not designed solely to elicit testimonial evidence from a suspect.'" (citations omitted) Here, there was no indication that Mr. Pittman posed a threat to the officers' or public's safety. Moreover, the Government has offered no evidence demonstrating that Mr. Pittman, who was under the influence of drugs, knowingly and intelligently waived his Miranda warnings. Accordingly, this Court should exclude any and all statements made by Mr. Pittman as a result of the officers' failure to administer Miranda warnings.

## V.    CONCLUSION

The Court should suppress any and all evidence obtained as the result of the law enforcement officer's impermissible patdown, including evidence obtained during the search incident to arrest. The officer's patdown exceeded the scope of Terry v. Ohio, 391 U.S. at 1, because he reached into Mr. Pittman's pocket and instantly grabbed all of its contents instead of limiting his search to the suspected weapon. See also Adams, 407 U.S. at 143. Additionally, Mr. Pittman's alleged voluntary statements should also be suppressed because the law enforcement officers did not administer any Miranda warnings prior to, or during, Mr. Pittman's alleged voluntary statements. See Elstad.

Accordingly, this Court should exclude any and all evidence obtained from the impermissible

patodown, and any and all alleged statements made by Mr. Pittman in violation of his <u>Miranda</u> rights.

        /s/ Christopher S. Koyste
Christopher S. Koyste, Esquire
Assistant Federal Public Defender

Tieffa N. Harper, Esquire
Research & Writing Attorney

Attorneys for Lester Pittman

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF DELAWARE
ONE CUSTOMS HOUSE
704 KING STREET, SUITE 110
WILMINGTON, DE 19801
(302) 573-6010

Dated: April 27, 2007

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that the attached filing of Defendant, Lester Pittman, is available for public viewing and downloading and was electronically delivered on April 27, 2007 to:

Illana H. Eisenstein, Esq.
Assistant United States Attorney
1007 Orange Street, Suite 700
Wilmington, Delaware 19801

 /s/ Christopher S. Koyste
Christopher S. Koyste, Esquire
Assistant Federal Public Defender

Tieffa N. Harper, Esquire
Research & Writing Attorney

Attorneys for Lester Pittman

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF DELAWARE
ONE CUSTOMS HOUSE
704 KING STREET, SUITE 110
WILMINGTON, DE 19801
(302) 573-6010

Dated: April 27, 2007