IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 06-131- SLR |
| | ) | |
| LESTER PITTMAN | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL MOTION TO SUPPRESS

**NOW COMES** the United States of America, by and through its undersigned attorneys, and hereby responds to Defendant's Memorandum of Law in Support of Pretrial Motion to Suppress, and respectfully requests that this Court deny the defendant's Motion to Suppress for the reasons that follow:

### INTRODUCTION

On November 16, 2006, the Grand Jury for the District of Delaware indicted the defendant, Lester Pittman, on one count of possession with intent to deliver over 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). The charges stemmed from the defendant's October 6, 2006, arrest in which cocaine base was found on the defendant's person and in his vehicle following a traffic stop. On January 26, 2007, the defendant filed a Pre-trial Motion to Suppress Evidence, and on March 28, 2007, this Court held an evidentiary hearing on this Motion.

## PROPOSED FINDINGS OF FACT

### *A.   Information from a Past-Proven Reliable Informant*

Prior to the arrest of the defendant, Task Force Officer Ronald Marzec was supplied with information from a confidential informant (CI), who had been present when an older black male known to the CI as "Les," was converting powder cocaine to crack cocaine, and conducting drug transactions at a house on North Second Street, Delmar Delaware. The CI stated that this house was owned by an individual known as "Rene" and described the house as being located behind the "IGA." Suppression Hearing Transcript (March 28, 2007) at 10 [hereinafter "Supp. Tr."]. The CI also reported that "Les" drove a gold GMC Yukon with Maryland registration. Supp. Tr. 10.

The CI had proven reliable in the past, providing information which led to the arrest of two other individuals, including the seizure of firearms and controlled substances. Supp. Tr. 10. Officer Marzec was also able to corroborate the CI's information regarding "Les." Officer Marzec was already familiar with the nickname "Rene" as referring to Warren Brittingham, and he knew through previous drug investigations that Brittingham's house was in fact located on North Second Street at the location specified by the CI. Supp. Tr. 10. Following his meetings with the CI, Officer Marzec conducted surveillance on Brittingham's house, and two or three times observed the Gold GMC Yukon described by the CI parked outside. Officer Marzec also learned that the Gold Yukon was registered to Robany Pittman, Lester Pittman's wife. Supp. Tr. 12.

### *B.   Surveillance leading up to the Defendant's Arrest.*

On October 6, 2006, between approximately 6:30 p.m. and 7:45 p.m., Officer Marzec conducted surveillance at Brittingham's house and again saw the Gold Yukon parked outside. Supp. Tr. 15. Officer Marzec used binoculars to observe an individual — later identified as the defendant,

2

Lester Pittman — come from the house and enter the Gold Yukon's driver-side door. Supp. Tr. 15-17. Just as the defendant was getting into the car, another car, driven by an unknown white male, backed in behind the Yukon. Supp. Tr. 20. From his vantage point, Officer Marzec could clearly see the white male approach and engage in a hand-to-hand transaction with the defendant. Supp. Tr 20. Based on Officer Marzec's training and experience, and from his specific observations of the type of objects exchanged and the manner in which they were handled and received, he concluded that he had witnessed a drug transaction between the defendant and the white male. Supp. Tr. 20-22. Following the transaction, both cars drove away. Supp. Tr. 23.

Officer Marzec followed the defendant's car and observed him commit a traffic violation by failing to properly signal for a turn. Supp. Tr. 25. Based on his observations, Officer Marzec radioed for Officer Thomas Esham of the Delmar Police Department to conduct a traffic stop.[1] Officer Esham pulled in between Officer Marzec and the defendant's vehicle, and observed an additional traffic violation when the defendant crossed the center line. Supp. Tr. 98.

Officer Esham initiated a traffic stop and the defendant pulled over approximately 100 yards south of Line Road, just over the Maryland-Delaware border. Supp. Tr. 98-99. He noticed that the defendant appeared very nervous, to the point that he was shaking and his voice was "crackling." Supp. Tr. 100. Officer Esham returned to his police car to write up a warning, following his normal traffic stop procedures. Supp. Tr. 100-01, 104-06.

---

[1] Officer Marzec had contacted Officer Esham approximately an hour earlier to inform him that he was conducting surveillance of drug activity in the area, and Officer Esham therefore remained nearby. Supp. Tr. 24-25, 94.

### C.    *Pat-Down and Arrest of the Defendant.*

Meanwhile, Officer Marzec requested a K-9 unit from the Wicomico County Sheriff's Office. Supp. Tr. 132. While Officer Esham was still processing the traffic violation, Deputy First Class Karl Kurten of the Wicomico County Sheriff's Department arrived, approached the defendant's car, and told the defendant that he was going to conduct a K-9 scan. Supp. Tr. 132-33. Deputy Kurten observed that the defendant appeared nervous. Supp. Tr. 133. The defendant asked the officers if he could get out of the car while the K-9 scan was being conducted. Supp. Tr. 134.

When the defendant got out of the car, he was "reluctant" to comply with Deputy Kurten's instructions to keep his hands on the vehicle, and kept attempting to put his hand in his exterior jacket pocket. Supp. Tr. 134. When Deputy Kurten conducted an exterior pat-down search for weapons, he could see a heavy object swinging, and could feel a heavy object, about five inches long, which based on its length and weight, he believed to be a knife. Supp. Tr. 135, 138. Deputy Kurten asked the defendant what the object was and whether it was a knife. The defendant did not respond, and again attempted to put his hands into this pocket.[2] Supp. Tr. 135; 143.

---

[2] The transcript of Deputy Kurten's testimony has a transcription error on page 135. The transcript reads:
> A. . . . "As I was going down the jacket the jacket was swinging because it wasn't zippered up and I felt a heavy object in the pocket and I asked him what that was. *He said it was a knife.*"
> Q:    "And how did the defendant respond."
> A.    "He didn't. He attempted to put his hands back in his pocket."

Supp. Tr. 135, lines 1-7. It is clear from the context of the foregoing statement, and the entire direct and cross examination that Deputy Kurten did not testify that the defendant "said it was knife," but rather that Deputy Kurten asked *whether it was a knife*, and that the defendant made no response. *See also* Kurten Cross Exam, Supp. Tr. 143 ("First I asked him what the item was. And when he didn't answer, I wanted to make sure it was not a weapon."). The Government has spoken with defense counsel and he agrees that Deputy Kurten's testimony was that "I asked him what that was, whether it was a knife" and that the defendant made no response.

4

Deputy Kurten then "reached in with one hand, [and] pulled [the object] out . . . without fishing around in the pocket" by "scoop[ing]" the object out, keeping his "hand loose . . . to limit the chance of myself getting stuck or cut." Supp. Tr. 136. Deputy Kurten demonstrated the movement he used to reach into the pocket by using a cupped hand to lift the object from the pocket in a single motion. Supp. Tr. 136. The object he removed turned out to be a flashlight. Along with the flashlight, however, came a partial cigarette butt and a baggie containing what appeared to be crack cocaine. Supp. Tr. 136, 138. Deputy Kurten testified that he was looking only to pull the heavy object out of the pocket, but that cigarette butt and bag of suspected crack cocaine were sitting right on top of the flashlight. Supp. Tr. 138; *see also* Supp. Tr. 144 ("[M]y objective was to remove the item and make sure it wasn't a weapon.").

Based on the discovery of the suspected crack cocaine, Officer Marzec and Deputy Kurten placed the defendant under arrest. A search incident to arrest yielded another baggy containing suspected crack cocaine in the defendant's left front jacket pocket. Supp. Tr. 35. An inventory search of the defendant's gold Yukon revealed two additional baggies of suspected crack cocaine in a compartment in a rear cargo area of the vehicle, as well as a digital scale, a cellular phone, and some paperwork. Supp. Tr. 37.

The total time the defendant was stopped until he was placed under arrested was no longer than the time necessary for Officer Esham to conduct his normal traffic stop procedure — about 15 or 20 minutes. Supp. Tr. 102, 106.

---

### D.     *Post-Arrest Statements by the Defendant.*

After the defendant's arrest, Officer Esham transported him back to the Delmar Police Station. During the trip, the defendant initiated a conversation in which he made several statements, arguing that he was going to "get off this," and that it was an "illegal search and seizure and false arrest." Supp. Tr. 111. Officer Esham had not questioned the defendant and made no comment in response to the defendant's statements. Supp. Tr. 111.

After the defendant was brought to the Delmar Police Station, the defendant initiated another conversation in the presence of Officer Esham and Deputy Kurten. Neither of the officers had engaged the defendant in conversation or asked him any questions. Supp. Tr. 141. The defendant voluntarily discussed the cash box that was found in the Gold Yukon, and stated it contained old coins, silver certificates and a letter, and was seeking assurance that his property was secure. Supp. Tr. 141. The officers assured him that it was secure. Officer Kurten then inquired why he kept the box in the truck, and the defendant replied that it was a safe place to keep the box because "no one else ever gets in the truck." Supp. Tr. 142.

A short time later, the defendant told the officers that he was not feeling well. Supp. Tr. 142. The officers asked the defendant if he swallowed any drugs to determine his need for medical assistance, and he acknowledged that he had swallowed rocks of crack cocaine during the traffic stop. Supp. Tr. 113-14, 142. The defendant was sent in an ambulance to Peninsula Regional Medical Center for treatment, where he remained for several hours, guarded by Officer Marzec. Supp. Tr. 40.

While he was recovering at the hospital, the defendant initiated a conversation with Officer Marzec, by listing people who might have set him up, including mentioning the name "Rene" —

referring to Warren Brittingham, the owner of the house at which the initial hand-to-hand transaction was observed. Supp. Tr. 40-41. Officer Marzec testified that he was present with the defendant for several hours, and that the defendant "talked the whole time," notwithstanding the fact that Officer Marzec, "tried not to converse with the defendant," and had even "moved my chair on several occasions to get out of Mr. Pittman's sight, so he would stop talking." Supp. Tr. 40. Officer Marzec testified that he did not ask Mr. Pittman any further questions other than minimal responses to the defendant's statements, but that the defendant would "look at me almost waiting for a response," and the "just continued" talking. Supp. Tr. 41.

## ARGUMENT

The defendant contends that the police lacked probable cause to conduct the traffic stop of the defendant's vehicle, and further challenges the pat-down of the defendant's clothing that led to the discovery of crack cocaine. The defendant also asks this Court to suppress statements made by the defendant while he rode with Officer Esham to the police station and while he was recovering in the hospital. In light of the evidence presented at the suppression hearing, however, each of these arguments is without merit.

### A.    *The Officers Had Reasonable Suspicion to Conduct the Traffic Stop.*

There was reasonable suspicion to make the traffic stop based on the traffic violations observed by Officer Marzec and Officer Esham. *United States v. Delfin-Colina*, 464 F.3d 392, 397-98 (3d Cir. 2006) (holding that "the *Terry* reasonable suspicion standard applies to routine traffic stops" such that "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating

a traffic law at the time of the stop"). The officers observed two separate traffic violations, either of which was sufficient justify the initial stop.

Alternatively, the stop was justified based on the information gleaned from the CI regarding the defendant's drug activities, combined with Officer Marzec's observations of the defendant engaging in a hand-to-hand drug transaction immediately preceding the traffic stop. *See United States v. McGlory*, 968 F.2d 309, 343 (3d Cir. 1992) ("[The officer] observed Tempolski approach Cotton's vehicle, get in the vehicle, and hand Cotton money. These circumstances plainly gave rise to a reasonable suspicion sufficient for an investigative stop.").

At the time Deputy Kurten arrived at the scene of the traffic stop and conducted the pat-down of the defendant, Officer Esham had not completed processing the traffic violation and the defendant had been detained for approximately fifteen minutes. At this point, the traffic violation alone was sufficient justification for the stop. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (upholding a dog sniff conducted during the time the defendant was lawfully seized for a traffic violation).

**B. The Pat-Down Justified by a Reasonable Suspicion that the Defendant Was Armed, and Was Limited to a Search for Weapons.**

Once the traffic stop was conducted, Deputy Kurten were entitled to conduct a pat-down search of the defendant based on reasonable suspicion that he was armed. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Officer Kurten had reasonable suspicion that the defendant was armed based on the observation of a heavy object in the defendant's pocket, which he believed to be a knife, and bolstered by the fact that the defendant would not comply with the order to keep his hands on the police cruiser, the defendant's repeated attempts to reach his hand inside the exterior pocket of his sweatshirt, and the defendant's refusal to answer whether the object was a knife. *See United States*

v. *Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) ("Moorefield's furtive hand movements and refusal to obey the officers' orders [to show his hands and exit the vehicle] constituted suspicious behavior . . . Moorefield leaned back and appeared to shove something down toward his waist. Moorefield's behavior embodied the kind of specific, articulable facts that *Terry* contemplates and, therefore, warranted a pat-down search for weapons.").[3]

Officer Kurten conducted a limited pat-down of the exterior of the defendant's clothing and did not reach into the defendant's pocket until after he felt a long, hard object that he reasonably believed was a weapon. It was at this point that Officer Kurten justifiably reached into the defendant's pocket to take out the object, which turned out to be a five-inch flashlight. *See United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (holding that officer lawfully reached into the defendant's pocket and opened a four-by-six inch envelope, because a small-caliber handgun could have "roughly the same feel inside the envelope as did the credit cards it [in fact] contained."). The partially smoked cigarette and the baggy of suspected crack cocaine came out together during the removal of the flashlight.

The defendant claims that this procedure exceeded the scope of a *Terry* pat-down because Deputy Kurten testified that he "cupped the objects and then lifted them out of the pocket" and asserts that this motion constituted a "rummage and seizure at will." Defendant Memorandum of Law at 9-10. But Deputy Kurten testified that he "scooped" the object and kept his "hand loose"

---

[3] Reasonable suspicion regarding weapons may also be established by information that the defendant was involved in drug activity — including the evidence from the CI that the defendant was dealing drugs and Officer Marzec's observation of the hand-to-hand transaction involving the defendant immediately before the stop. *See United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) (upholding pat-down where officer "became concerned for his safety because persons involved with drugs often carry weapons" and concluding that "[t]his procedure is the very essence of the practice sanctioned by *Terry v. Ohio*").

because he believed that the object to be a knife and thus wanted "to limit the chance of myself getting stuck or cut." Supp. Tr. 136. As Deputy Kurten demonstrated for the Court at the evidentiary hearing, the partial cigarette and baggie of crack cocaine came out in one fluid motion with the flashlight. Deputy Kurten was surely entitled to pull the object out in a manner which was "reasonably necessary to protect [his] personal safety . . . during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

The discovery of crack cocaine established probable cause for the defendant's arrest, which in turn justified the search incident to arrest and the subsequent inventory search. *See McGlory*, 968 F.2d at 343 (finding that once a small amount of heroin was discovered as a result of a pat-down search, and a bag of powder was observed in the front seat, "[t]hese additional circumstances converted the initial reasonable suspicion into probable cause to search the vehicle").

In sum, at each stage of the traffic stop, pat-down, arrest, and search, the officers acted in full compliance with the requirements of the Fourth Amendment. Suppression of the evidence, therefore, is wholly unwarranted.

### C.    *The Defendant's Statements Were not the Product of Custodial Interrogation.*

The defendant also argues that this Court should suppress all of his statements while he was in custody because he was not informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Def. Memo at 10. The defendant contends that the failure to administer *Miranda* warnings is itself sufficient to "create[] a presumption of compulsion," and claims that the officers' very silence was "an attempt to circumvent *Miranda*'s requirements." Def. Memo at 12.

In *Rhode Island v. Innis*, 446 U.S. 291 (1980), however, the Supreme Court made clear that "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply

taken into custody," rather *Miranda* applies only "where a suspect in custody is subjected to *interrogation*." *Id.* at 300 (emphasis added). The Court elaborated that "interrogation" "as conceptualized in the *Miranda* opinion, requires a measure of compulsion above and beyond that inherent in custody itself," and limited the definition of "interrogation" to words or actions by law enforcement which are "reasonably likely to elicit an incriminating response." *Id.* at 301.

The Government acknowledges that the defendant was in custody for purposes of *Miranda*, but submits that the defendant spontaneously initiated each of his statements, such that none of his statements were the product of custodial interrogation. Such voluntary admissions are clearly admissible. *See Miranda*, 384 U.S. at 478 ("Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

Certainly the comments made by the defendant in the patrol vehicle were not the product of custodial interrogation because Officer Esham asked no questions of the defendant and did not respond to the defendant's monologue. For the same reason, the defendant's statements to Officers Kurten and Esham at the Delmar police station regarding the contents of the cash box found in the defendant's Gold Yukon are admissible because the defendant voluntarily and spontaneously initiated this conversation.

After these spontaneous statements, Deputy Kurten asked the defendant why he kept the cash box in the truck, and the defendant responded that he keeps the box there because no one else ever

gets into his truck. Courts of appeals have held that such a "request for clarification of a spontaneous statement generally does not constitute interrogation." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005).[4] Similarly, the defendant's statements in the hospital were spontaneous and were not made in response to any actions or questions by Officer Marzec. Officer Marzec gave minimal responses to the defendant's lengthy colloquy and even testified that he took lengths to avoid conversing with the defendant. To the extent any question was asked of the defendant, it was of the limited, clarifying nature that did not rise to the level of police interrogation.

Immediately before being taken to the hospital, the defendant had told officers that he was not feeling well and Deputy Kurten and Officer Esham asked the defendant if he had swallowed any drugs. The defendant's affirmative response falls under the public safety exception recognized by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 656 (1984), which held that *Miranda* does not apply to situations "in which police officers ask questions reasonably prompted by a concern for the public safety." Here the officer's questions were reasonably required to determine the defendant's need for medical treatment. *Quarles* warned against placing police in the "untenable position" of having to decide between "neutralizing the volatile situation confronting them" and rendering otherwise probative evidence of criminal activity inadmissible because of the lack of

---

[4] *See also United States v. Morton*, 391 F.3d 274, 276 (D.C. Cir. 2004) ("Officer Parker's statements-that [the defendant's] vehicle would be impounded and that she had been arrested on a serious charge . . . were directly responsive to what the defendant had said and were not reasonably likely to elicit an incriminating response."); *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (admitting, in the absence of the *Miranda* warnings, a custodial colloquy between a police officer and the defendant in which the defendant volunteered the statement, "I stabbed her," the police officer responded, "Who?" and the defendant said "Cathy"); *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (finding no interrogation occurred where drug dealer saw police officers were confiscating his notebook and said, "You can't take that," to which a police officer responded, "Why" and drug dealer stated, "I can't run my business without that"); 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.7(d) (2d ed. 2007).

*Miranda* warnings. *Id.* at 657-58. The officers in this case had to make a prompt determination regarding the defendant's medical needs, and thus *Quarles* would not require them to precede their questions with the *Miranda* warnings.

As the defendant was never subject to interrogation, his voluntary and spontaneous statements are admissible under *Miranda* and *Innis*, and should not be suppressed by this Court.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court deny, the defendant's Motion to Suppress Evidence.

>
> Respectfully submitted,
> COLM F. CONNOLLY
> UNITED STATES ATTORNEY
>
> BY: /s/ Ilana H. Eisenstein
>     Ilana H. Eisenstein
>     Assistant United States Attorney

Dated: May 11, 2007.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 06-131- SLR |
| | ) | |
| LESTER PITTMAN | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I, Jennifer Brown, an employee in the Office of the United States Attorney, hereby certify under penalty of perjury that on May 11, 2007, I electronically filed:

### GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL MOTION TO SUPPRESS

with the Clerk of Court using CM/ECF. Said document is available for viewing and downloading from CM/ECF, which will send notification of such filing(s) to the following:

Christopher Koyste
Assistant Public Defender
District of Delaware
704 King Street, Suite 110
Wilmington, DE 19801

                                                                                                                                                                                        /s/Jennifer Brown
                                                                                                                                                                                        Jennifer Brown