IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 06-131-SLR |
| | ) | |
| LESTER PITTMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

**I. INTRODUCTION**

On November 16, 2006, defendant Lester Pittman was indicted by a grand jury

for possession with the intent to distribute more than 50 grams of cocaine base, in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). (D.I. 2) Before the court is

defendant's motion to suppress evidence obtained as a result of the traffic stop and

subsequent protective pat-down. (D.I. 12) Defendant has also moved to suppress

statements made after his arrest. Plaintiff United States of America has filed

opposition, to which defendant has filed a reply. (D.I. 15, 21, 22, 23) An evidentiary

hearing was held on March 28, 2007, with three law enforcement witnesses testifying.

(D.I. 16) The court has jurisdiction pursuant to 18 U.S.C. § 3231. For the reasons that

follow, the motion is denied.

**II. FINDINGS OF FACTS**

Pursuant to Federal Rules of Criminal Procedure 12(d), the following constitutes

the court's essential findings of fact.

1. In the fall of 2006, Delmar Police Detective Ronald Marzec ("Marzec"), a 10 year veteran task force officer with the Drug Enforcement Administration ("DEA"), received information from a confidential informant ("CI") about drug dealers operating in Wicomico County, Maryland and Sussex County, Delaware.[1] (D.I. 19 at 8-9) Specifically, the CI had been present in a home located on North Second Street, Delmar, Delaware, when an older black male, known as "Les,"[2] was converting cocaine powder into crack cocaine for sale from the residence. (Id. at 10-11) The CI advised that the residence was owned by "Rene"; from previous drug investigations, Marzec knew that "Rene" was "Rene Brittingham." (Id. at 10) The CI informed that defendant operated a gold color Yukon with Maryland registration ("the Yukon").

2. Marzec investigated and verified the CI's information. Consequently, two individuals were arrested for possession of controlled substances, firearms and related currency. (Id.) Marzec also discovered that the Yukon was registered to defendant's wife. (Id. at 12) Marzec commenced surveillance at the Second Street residence and observed the Yukon parked there on two occasions.

3. On October 6, 2006, Marzec was conducting surveillance on the residence. Because of the location of his surveillance, Marzec utilized binoculars for assistance.

---

[1] In the course of his work for the Delmar Police Department and the DEA, Marzec has investigated numerous controlled substance violations and conducted over 100 arrests involving crack cocaine. (Id. at 8) During his career, Marzec has observed over 50 hand-to-hand drug transactions. (Id. at 21) He has also attended numerous seminars and training sessions wherein hand-to-hand transactions were discussed. (Id. at 22)

[2] This individual was identified as defendant. (D.I. 19 at 10)

2

(Id. at 15; GX1)  He observed the Yukon parked in the driveway of the residence.  At approximately 6:30 p.m., Marzec observed defendant enter the Yukon when another vehicle pulled into the driveway and parked behind the Yukon.  An unidentified white male exited this car and approached the Yukon's driver's side window.  (Id. at 20)  Marzec observed the white male remove his hand from his pocket while holding an object and reached his hand into the Yukon's driver's side window in order to hand defendant an object.  The white male then removed his hand, holding an object that Marzec thought was cocaine.  (Id. at 20-23)  Based on his extensive training and experience, Marzec recognized this exchange as a drug transaction.  (Id. at 20)

4.  Defendant's Yukon pulled out of the driveway and proceeded south on North Second Street.  (Id. at 23)  Marzec proceeded to pursue defendant.  While following the Yukon, Marzec observed defendant negotiate a turn without using a turn signal.  Marzec contacted Delmar Police Officer Thomas Esham[3] to advise him of the situation.  Marzec also contacted a K-9 handler, Deputy Karl Kurten, of the Wicomico Sheriff's Department.[4]  (Id. at 24)  Marzec requested that Esham conduct a traffic stop on the Yukon for failure to properly use a turn signal.  (Id. at 94--96)  It is Marzec's normal practice when conducting surveillance to notify local authorities and K-9 narcotic units of ongoing matters.  (Id. at 24)

---

[3]"Esham" has over nine years experience as a patrol officer with the Delmar Police.  (Id. at 93).

[4]"Kurten" is a K-9 handler assigned to road patrol.  (Id. at 129)  He has been employed by the Wicomico County Sheriff's Department since January, 2002.  He has conducted hundreds of pat-down searches during his law enforcement career.  (Id. at 137)

3

5. Esham, in a marked police vehicle, responded to the area and commenced following the Yukon. Esham observed the Yukon cross the center divider line and travel above the posted 25 mile per hour speed limit. (Id. at 98) Esham activated the red and blue flashing lights to pull over the Yukon. (Id. at 99) Esham approached the Yukon to explain the reason for the stop. Defendant appeared nervous. Esham observed defendant's hands shaking and his voice cracked while speaking. (Id. at 100) Defendant provided Esham with his license and registration. Esham returned to his vehicle to check the defendant's documentation.

6. Kurten arrived at the scene, exited and left his K-9 dog in the vehicle. Kurten was joined by Marzec as they approached the Yukon. Kurten advised defendant that he would be conducting an exterior scan of the Yukon with the K-9 dog. (Id. at 132-133) Defendant asked to exit the Yukon during the K-9 scan. (Id. at 133) Kurten observed defendant acting nervously by repeating questions, stalling and looking around.

7. After defendant exited the Yukon, Kurten told him that a pat down search for weapons would occur. (Id. at 134) Kurten observed defendant attempting to put his hand into his exterior jacket pocket. Kurten told him to keep his hands out of his pocket; defendant reluctantly complied. As Kurten was conducting the pat down, he felt a heavy object in defendant's jacket pocket. (Id. at 135) Concerned that defendant was carrying a knife in the jacket pocket, Kurten repeatedly asked defendant to identify the object. Defendant did not respond; instead, defendant attempted to put his hands into the jacket pocket. For his safety and protection, Kurten reached into defendant's jacket pocket. In order to avoid being cut or stuck by what Kurten believed to be a

4

knife, he kept his hand loose as he slowly scooped into defendant's pocket.[5] (Id. at 136) From the pocket, Kurten removed a flashlight, a baggy containing crack cocaine and a cigarette. (Id. at 136, 138) The baggy and cigarette were resting on top of the flashlight. (Id. 138)

8. Defendant was placed under arrest and a search incident to arrest yielded another baggy containing crack cocaine in defendant's left front pocket. (Id. at 35) The Yukon was searched and two more baggies of crack cocaine and a digital scale were found (Id. at 139-140; 37)

9. Esham transported defendant to Delmar Police Station for processing. (Id. at 111) During the ride, Esham did not issue defendant Miranda warnings nor did he ask defendant any questions. Defendant told Esham that the traffic stop and search were illegal.

10. At the station, defendant was secured and handcuffed to a bench while the processing and paperwork began. Kurten was in the same area completing paperwork when defendant asked him if a metal box containing particular valuables had been recovered from the Yukon. (Id. at 141) Kurten asked defendant the reason for keeping valuables in his car, to which defendant replied. Kurten had not advised defendant of Miranda warnings prior to this discussion.

11. At about the same time, Esham brought defendant coffee and noticed defendant seemed uneasy. (Id. at 113) Defendant said he felt nauseous and Esham responded with a trash can. Esham testified that defendant continued to complain and

_____

[5]Kurten demonstrated how he conducted the pat down and pocket sweep at the evidentiary hearing. (Id. at 136)

5

became increasingly nervous. Esham asked defendant if he had ingested some of the "dope." Defendant did not respond. Sensing defendant's reluctance and concern, Esham stated:

> I expressed to him that if he was worried about catching a criminal charge if he had swallowed any of the dope not to be, because at this point the law enforcement action stops and his health and welfare was the most important part at that point.

(Id. at 113-114) Defendant responded affirmatively that he had ingested a "couple of big rocks." (Id. at 114)

12. Defendant, accompanied by Marzec, was transported by ambulance to the hospital. (Id. at 40) During the course of the several hours of treatment at the hospital, Marzec stayed with defendant. At no time did Marzec administer Miranda warnings to defendant. (Id. at 41) Marzec testified that defendant repeatedly initiated conversation with him. Defendant was particularly interested into determining the identity of the person he believed had set him up. Marzec did not question defendant; instead, Marzec attempted to stop the defendant from talking by moving his chair out of defendant's view. (Id. at 40)

## III.  CONCLUSIONS OF LAW

### A. Protective Pat Down Search

1. It is undisputed that a law enforcement officer may lawfully stop a vehicle after observing a violation of state traffic laws. Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977); United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004). Such stops are reasonable, generally, so long as they "last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). Traffic stops are

dangerous encounters that can result in assaults and murders of law enforcement officers. Maryland v. Wilson, 519 U.S. 408, 413 (1997). An officer effectuating a reasonable investigatory stop should have the opportunity to protect himself from assault by a suspect. Terry v. Ohio, 392 U.S. 1, 24 (1968). To that end, an officer is permitted to conduct a limited protective search for concealed weapons when the suspect gives the officer reason to believe that he may be armed and dangerous. Id. at 27-30. A primary purpose of such a search is the protection of the law enforcement officer. Id. at 24. For the search to be justified, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences drawn from those facts, reasonably warrant the intrusion." Id. at 21.

2. The court finds Kurten's manner and demeanor during testimony credible. His uncontroverted testimony establishes that he observed a heavy object in defendant's jacket pocket which, based on his experience, Kurten suspected was a knife. When ordered by Kurten to keep his hands out of his jacket pocket, defendant reluctantly obliged. In response to Kurten's inquiries into whether the object was a knife, defendant failed to respond. Considered together, these facts constitute reasonable suspicion for Kurten to conduct the protective pat down search for weapons. During the pat down, Kurten felt the heavy object in defendant's jacket and reached into the pocket to remove it. Believing it was a knife, Kurten cupped his hand in order to scoop out the object and avoid being stabbed or cut. There is no evidence of record to suggest that Kurten manipulated his hand in this manner for any other reason than to protect himself from being injured.

3. Although defendant contends the pat down search exceeded the scope

7

necessary to determine whether defendant possessed a weapon, the court finds that Kurten's conduct was reasonable and not excessive. The discovery of the baggy containing crack cocaine was an inadvertent result of Kurten's removal of an object he was reasonably justified in believing was a knife.

## B. Miranda Warnings

1. Defendant argues for suppression of any statements made after he was in custody because he was not informed of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (D.I. 21) Plaintiff concedes that defendant was in custody, but asserts that his statements were spontaneously initiated and not the product of questioning by officers. (D.I. 22)

2. The Fifth Amendment to the United States Constitution, which applies to the states by way of the Fourteenth Amendment, provides that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. Amend. V; U.S. Const. Amend. XIV; Malloy v. Hogan, 378 U.S. 1 (1964).

3. In the seminal case, Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), the Supreme Court held that

the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

8

4. In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court concluded that not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." Id. at 299. Rather, only those statements resulting from questioning or action "that the police should know are reasonably likely to elicit an incriminating response" have been characterized by the Supreme Court as the product of custodial interrogation. Id. at 301.

5. The uncontradicted record establishes that defendant made statements without the benefit of Miranda warnings while: (1) being transported to the Delmar police station; (2) while sitting on a bench at the Delmar police station; (3) becoming ill from the ingested crack cocaine; and (4) at the hospital. Considering the demeanor and manner of the testifying officers, the court finds their testimony credible as to the circumstances surrounding defendant's statements. Significantly, their testimony reflects that defendant was not subjected to interrogation. Instead, defendant initiated conversation and made statements during the transport to and at the police station, and while at the hospital. To the extent that defendant was presented with requests for clarification, the court finds that these conversations do not rise to the level of interrogation. United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005). Moreover, when Esham asked defendant if he had ingested any drugs (after becoming ill), the record does not reflect that the inquiry was made to illicit an incriminating response; rather it was made to assist defendant and prevent harm.

## IV.   CONCLUSION

At Wilmington this   *16th*   day of July, 2007,

IT IS ORDERED that:

9

1. Defendant's motion to suppress is denied.  (D.I. 12)

2. A telephonic status conference is scheduled for **Wednesday, July 25, 2007**

at **9:00 a.m.**, with the court initiating said call.

3. The time between this order and **July 25, 2007** shall be excluded under the

Speedy Trial Act in the interests of justice.  18 U.S.C. § 3161(h)(8)(A).


United States District Judge

10